[L. A. No. 3997.    Department Two.—Filed November 14, 1917.]

JOHN GRIFFIN JOHNSTON, Plaintiff and Respondent, v. CITY OF LOS ANGELES (a Municipal Corporation), Defendant and Respondent.

DEED—CONDITION SUBSEQUENT—REVERTER FOR BREACH—RIGHT OF RE-ENTRY—TRANSFERABILITY.—The common-law rule that the benefit of a condition subsequent in a deed could be reserved only to the grantor and his heirs has been changed by section 1046 of the Civil Code, which provides that "a right of re-entry, or of repossession for breach of condition subsequent, can be transferred."

ID.—ESTATE IN REVERSION—CONDITION SUBSEQUENT—ASSIGNMENT BEFORE BREACH.—The reservation in a grantor of the right to re-enter, on abandonment by the grantee of the designated purpose and use for which land is granted, is a contingent estate and not a mere naked possibility of a future right, and such an estate, under section 699 of the Civil Code, may pass by will or transfer.

ID.—CONDITION SUBSEQUENT—CONSTRUCTION.—Under a deed of gift to a city of land described as a dam, reservoir and ditch, and identifying the property as the "reservoir, dam, and ditch delineated on a map" accompanying a specified report of "Consulting Engineers on the Subject of Water Supply for Irrigation," which deed contained a condition that in case the city should "cease to use the said premises for the said purposes of the erection and maintaining of said dam, reservoir, and ditch," the premises should revert to and become the property of the grantor, his heirs, executors, administrators, or assigns, it was plainly intended that the city should enjoy the use of the property for its reservoir and ditches, so long as it maintained them as a part of its irrigation system as then contemplated, that its right should be forfeited upon its abandonment of the property for the designated use, and that the reservation in the grantor was one which should pass to the heirs or assigns of the grantor.

ID.—CONDITION SUBSEQUENT—BREACH OF CONDITION—INJUNCTION.—If, in such a case, a city prepared to use the land for a fair ground,

park, public building, or other similar purpose, an assignee of the grantor could invoke the powers of a court of equity to prevent such a consummation.

ID.—CONDITION SUBSEQUENT—RIGHT TO ENFORCE—RESIDUARY DEVISEE OF GRANTOR.—The estate in reversion left in a grantor by such a deed is sufficient foundation for the right of a residuary devisee to enforce a forfeiture by re-entry for breach of a condition subsequent.

CROSS–APPEALS by plaintiff and defendant from a judgment of the Superior Court of Los Angeles County, and appeal by plaintiff from an order denying a new trial. Curtis D. Wilbur, Judge.

Charles Lantz, and Gibson, Dunn & Crutcher, for Plaintiff, Appellant, and Respondent.

Albert Lee Stevens, City Attorney, and Myron Westover, Deputy City Attorney, for Defendant, Appellant, and Respondent.

MELVIN, J.—On December 13, 1877, Dr. John S. Griffin, plaintiff's predecessor, executed a deed reciting the nominal consideration of one dollar, whereby he granted to the city of Los Angeles the land which is the subject of this suit. The deed contained a provision (which we shall presently quote) to the effect that if the city should cease to use the premises for the purposes outlined in the grant, the property should revert to the grantor, his heirs, executors, administrators, or assigns. In November, 1910, this action to quiet title, based upon the theory of the city's abandonment of the premises for the purposes contemplated by the grantor, was commenced. The city of Los Angeles denied that it had ceased to use the land for the maintenance of a dam, reservoir, etc., and after trial of the issues joined the court rendered judgment granting plaintiff's prayer as to a part of the property and denying it as to the remaining portion. Each party to the action appeals from that portion of the judgment which is adverse, and the plaintiff also appeals from the order denying his motion for a new trial.

For a better understanding of the issues it will be necessary to quote from Dr. Griffin's deed to the city. It contains the following description of the land and the purposes of the grant as well as the conditions which would work a reversion.

"Beginning at a point in the prolongation of the southerly line of Downey avenue in the city of Los Angeles, from which beginning point the southwest corner of said Downey avenue and Thomas street bears south 89 degrees west 2,490 feet; thence in a northerly direction about 2,600 feet following the contour of the ground by horizontal curves to a point near the east line of the city; thence in a southerly direction about 3,000 feet, still following the contours of the ground by horizontal curves to a point near the easterly end of the proposed dam or Reservoir No. Five (5); thence westerly 850 feet across the valley to a point which would be on the same elevation as the end of the last mentioned course, or five (5) feet higher than the bottom of the new ditch which is to supply water to said proposed Reservoir No. 5. The end of the last mentioned course being the westerly end of said proposed dam; thence northerly 800 feet following the contour of the ground by horizontal curves to the point of beginning.

"The above described parcel of land includes all of the land lying within or below a horizontal plane extending northerly from the top of the dam as proposed, the top of said dam to be five (5) feet higher than the bottom of the ditch as now constructed, and containing twenty-four (24) acres of land, more or less.

"And the said party of the first part also grants, as aforesaid to the party of the second part, so much of his land situated below and to the south of said dam as is now necessary or may hereafter become necessary to be used for the proper erection, protection and maintenance of said dam and reservoir, including the land on which the present or future slope of the embankment of said dam may necessarily rest. And also the right of way over and upon the lands of the party of the first part for the purposes of constructing and maintaining and repairing said ditch and dam. And also the right to excavate, transport and use all earth, stone, rock and gravel from, over and upon all lands belonging to the party of the first part, which are now or may hereafter become necessary for the purposes of constructing, or maintaining, or repairing the said ditch, dam or reservoir. It is hereby understood by and between the parties to these presents that the reservoir, dam and ditch herein referred to are the reservoir, dam and ditch delineated on a map entitled 'Map of the city of Los

Angeles and vicinity accompanying the report of consulting engineers on the subject of water supply for irrigation, dated July 27, 1877.' And more fully described and located by the field notes and report accompanying said map, now in possession of M. Kelleher, city surveyor. Said reservoir being designated on said map as Reservoir No. Five (5), and being also shown on the annexed plat herewith recorded, to which reference is hereby made. . . .

"It being also expressly understood and agreed by and between the parties hereto, that in case the party of the second part shall cease to use the said premises for the said purposes of the erection and maintaining of said dam, reservoir and ditch that then and in that case the said premises hereinbefore conveyed shall revert to and become the property of the said party of the first part, his heirs, executors, administrators or assigns."

It seems very clear, from the terms of the deed and particularly the words of the paragraph last quoted, that Dr. Griffin's gift to the city was made in contemplation of the continued maintenance of a reservoir and ditch as parts of a system of irrigation, and that it was his intention, clearly expressed in the deed accepted by his grantee, that failure on its part to maintain such instrumentalities and for the very purposes designated in the indenture would work a forfeiture. For example, anyone reading the deed would be forced to the conclusion that after the reservoir had been established and the ditch constructed and used, the disuse of the ditch and the dedication of the reservoir solely to the purposes of a public swimming-pool would amount to a perversion of the grant and give to the grantor the right to recall his gift. Or if the city should continue to use the reservoir but should devote the water not to irrigation but to the creation of electric power, a similar result would follow. The court, however, put a different construction upon the deed, as will readily appear from a consideration of the findings.

The court found among other things that the city accepted the deed; that it constructed the dam and ditch referred to in said instrument and in the report there specified of the board of engineers on the subject of water supply for irrigation dated July 27, 1877; that thereafter the ditch and dam were used continuously for general irrigation purposes by the city until the year 1904, at which time its use for said purposes

was discontinued; that since that time the city has several times each year used the water from said reservoir for the purpose of replenishing a lake in one of the public parks owned by the said city—a park which was not in existence until ten years after the execution of Dr. Griffin's deed; that for a portion of the time between 1904 and 1909 the water from the reservoir was used, without permission from or compensation to the city upon privately owned land near the dam; that the original irrigation ditch which was constructed to take water from the reservoir has not been maintained, but since 1904 the city has kept up a ditch leading from the reservoir to its park, using as a part of it that portion of the original ditch being about one hundred and fifty feet thereof which was conveyed by the deed from Griffin; and that: "All the water used in replenishing said lake has been taken from said reservoir, except on occasions when the reservoir was dry or the water was too low therein, on which occasions water was supplied for said lake from the city water system."

There were further findings by which the good condition of the dam since 1904 was declared and certain repairs to the water-gate and the valve to the service-pipe were described.

The court also found as follows: "Since the year 1904 water has not been conveyed into or from said reservoir through pipes or ditches constituting part of said general irrigation system as had been done prior thereto, and the ditches leading into and out of said reservoir have been destroyed, at and near the points where they formerly entered and left said reservoir . . . and the rights of way upon which said ditches were constructed beyond said land conveyed by said Griffin deed have been released by said city, and quitclaim deeds therefor executed and delivered to the owners of the lands over which they passed; and the spillway originally constructed to prevent overflow of said dam has been filled up by the construction of an electric railway; but the rain-water and storm-water from a large area has ever since said year 1904 drained into said reservoir and said reservoir has since that time held such water, when not dry, and such water has been used in the manner herein specified."

According to the findings, the reservoir was entirely dry during the latter half of the year 1910, and in August of that year plaintiff caused a part of the bed of said reservoir to be plowed. At times people living near the reservoir com-

plained of its unsanitary condition when the water was low and foul and at other times when copious rains had filled it the city's employees or others caused it to be partially drained to prevent injury to the adjoining lands from overflow. Since 1904 the amount of water obtained for the park and taken from the reservoir has required the use of "ten acres of the land conveyed by said Griffin deed lying within contour lines above said dam and easterly of Mission road."

In 1903, as the court also found, the land described in the deed from Dr. Griffin was conveyed by the city to its board of water commissioners. Thereafter, in 1905, after condemnation proceedings duly taken, Mission road was opened across the property in such manner as to separate about one acre of the westerly portion of the land from the rest of the tract. Within the lines of the roadway were included one and one-half acres of the land. The board of water commissioners paid an assessment of $4,383.15 upon the property east of the new road, but no award was made for the land taken and no payment was made of a purported assessment on the acre to the west of Mission road, but "said land on said westerly side was permitted to be sold by said city to a private party." Plaintiff's counsel stipulated that title to all streets included in the property was in the city. There were further findings that in 1910 the board of water commissioners adopted a resolution declaring this westerly portion of the property no longer useful as part of the site for a reservoir and advising its abandonment and sale for a price not less than five hundred dollars. On August 15, 1911, this resolution was rescinded. It was found that the plaintiff is the residuary devisee under the will of John S. Griffin, who died in August, 1898, distribution having been made to him by decree made and entered August 2, 1909, and containing the following language: "And that all the residue of said estate, whether described herein or not, be distributed to said John Griffin Johnston." While the decree described certain property specifically, the land here in controversy was not included in the description.

The conclusions of law were that as to the land east of Mission road and north of the dam embracing ten acres, as to the dam itself, and as to that ground south of the dam on which the present slope of the embankment rests, the city and its agencies have not at any time ceased to use said portion

of the premises in the manner specified in the Griffin deed; that said portion is owned by the board of public service commissioners of the city of Los Angeles; that title to all roads not within said ten acres is vested in the city; that all of the remaining land, by reason of the cessation of public use, has reverted to and vested in plaintiff in fee simple; and that neither party should recover costs. Judgment was entered accordingly.

It will be noted that Dr. Griffin died years before the city ceased to use the entire tract as a part of its irrigating system, and the first point made by the city is that plaintiff, as residuary devisee, took no estate in the premises by devise, because the right of re-entry, if any, arose after the death of the grantor and could not, therefore, be the subject of testamentary devise. It is argued that Dr. Griffin parted with every vestige of interest or estate in the land, retaining nothing which he could convey or transmit by descent; that any future relation between him and the property would be created by breach of the condition on the part of the grantee or its successors or assigns; and that such mere possibility of reverter was not a right to re-enter which could be assigned or devised. Counsel for the city of Los Angeles take the position, also, that the right to re-entry existed only in the grantor or his heirs. It is quite true that at common law the benefit of a condition subsequent in a grant of real estate could be reserved only to the grantor and his heirs, and this rule still prevails in states in which the common law has not been swept aside by statute. Such cases as *Upington* v. *Corrigan*, 151 N. Y. 143, [37 L. R. A. 794, 45 N. E. 359], and others cited by counsel for the city discuss this rule and trace its origin to a wish to discourage maintenance. But in California, by code provision, "a right of re-entry, or of repossession for breach of condition subsequent, can be transferred." (Civ. Code, sec. 1046.) This, as the code commissioners said of it at the time of its adoption, reverses the rule in force in New York. But, say counsel for the city, there is no right, no estate—nothing upon which an assignment may operate until after breach of condition. With this view we cannot agree. The deed of Dr. Griffin does, it is true, employ the words of conveyance usual in the transmitting of complete title in fee, but instruments of this kind are to be read, like other contracts, with the purpose of carry-

ing out the intention of the parties. "It is impossible to lay down an invariable and universal rule of construction. The tendency of modern decisions is to uphold conveyances, and give effect to the intention of the parties, regardless of technical rules of construction." (*Faivre* v. *Daley*, 93 Cal. 664–671, [29 Pac. 256].) Applying this rule to the deed before us we are forced to the conclusion that it was the intention of the parties to that instrument that the city should enjoy the use of the property for its reservoir and ditches so long as it maintained them as a part of its irrigation system as then · contemplated; that its right to hold the land should be forfeited upon its abandonment of the property for the designated use; and that the reservation in favor of the grantor was one which should pass to heirs or assigns of the grantor. It was a contingent estate, not a mere naked possibility of a future right, and, therefore, it was a species of property capable of passing by will or transfer. (Civ. Code, sec. 699.) If the city, ignoring the limiting words of the grant, had prepared to use the land for a fair ground, a park, or a place for storing municipal property, or as a site for a public building, there can be no doubt that the grantor's assignee could have invoked the power of equity to prevent such a consummation. (*Pavkovich* v. *Southern Pacific R. R. Co.*, 150 Cal. 39, [87 Pac. 1097] ; *Newlove* v. *Mercantile Trust Co. of San Francisco*, 156 Cal. 657, [105 Pac. 971].) And it is equally certain that the estate necessary to support the assignment in such a case is sufficient foundation for the right asserted by the plaintiff in this action. (*Taylor* v. *McCowen*, 154 Cal. 798–805, [99 Pac. 351].) We conclude, therefore, that the plaintiff has succeeded to the right of the grantor.

There is no force in the contention that under the terms of the deed the city was bound merely to erect and maintain the dam, ditch, and reservoir, but that the contemplated use of the water was not required; and *Reclamation Dist. No. 551* v. *Van Loben Sels*, 145 Cal. 181, [78 Pac. 638], cited to support this contention, does not do so. In that case the grant provided that the property should be used for reclamation purposes, reverting to the grantor when abandoned and used no more for such purposes. The court found that the land was used and had been continuously used for such purposes, and this court sustained the finding as supported by the evidence. In the case at bar the evidence and the

findings are that since 1904 the property has not been devoted in any manner or degree to the objects for which it was conveyed, namely, "the erection and maintaining of said dam, reservoir, and ditch"; nor does the case of *Behlow* v. *Southern Pacific R. R. Co.*, 130 Cal. 16, [62 Pac. 295], support the counsel for Los Angeles in their contention that irrespective of use the mere existence of the dam prevents the successful assertion of plaintiff's claim.   In that case it was held that irregular use of the property for railroad purposes sufficiently complied with the obligation to devote the land to railroad purposes only.   But here it was shown that aside from the occasional conducting to the lake in the park of the rain-water which had filled the reservoir, the city made no pretense of "maintaining" the dam, reservoir, or ditch, or of "making use of the premises" for such maintenance.   The lake had other sources of supply, and so little did the city's mandatories depend upon the reservoir as a means of filling the lake in the park, that the appliances connected with the reservoir were permitted to get out of repair.   In October or November, 1905, the reservoir was drained by the opening of the water-gate by a French woman living near—"an act of meanness," as one of the findings characterizes it.   During half of 1910 there was no water at all behind the dam, and the water commissioners, who held title for the city, solemnly declared the property abandoned so far as public use was concerned.   Perhaps, as now asserted, this declaration did not bind the city, but taken with all of the other testimony upon this subject, it has certain evidentiary value which must be regarded.   We fail to find any evidence or findings to support the conclusion of law that "defendants have not ceased to use" the indicated ten acres "in the manner specified in the Griffin deed."

It is contended by the city and admitted by plaintiff that restraints of this character are to be construed strictly against the grantor; but giving such interpretation to the deed before us, we are compelled to hold that plaintiff is in a position to maintain his action and to have his title quieted as to all of the land included in the original grant to the city by his predecessor in interest, except that part of it to which, by his stipulation, he admits the city has title.   This conclusion is supported by such authorities as *Papst* v. *Hamilton*, 133 Cal. 631, [66 Pac. 10]; *Firth* v. *Marovich*, 160 Cal. 257, [Ann.

Cas. 1912D, 1190, 116 Pac. 729], and *Parsons* v. *Smilie,* 97 Cal. 647, [32 Pac. 702].

That part of the judgment from which the city of Los Angeles appeals is affirmed. Those parts of the judgment and the order from which plaintiff appeals are reversed.

Henshaw, J., and Shaw, J., concurred.